IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 3, 2015 Session

**JAMES TODD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-00075      James M. Lammey, Judge**

_____

**No. W2014-00677-CCA-R3-PC  -  Filed May 6, 2015**

_____

Petitioner, James Todd, filed a petition for post-conviction relief, alleging that his trial counsel provided ineffective assistance by inadequately presenting a motion to suppress to the trial court.  Because trial counsel's performance was not deficient, the post-conviction court's denial of the petition is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Marvin Adams III (on appeal and at hearing), Larry Copeland and Samuel Rodriguez (at hearing), Germantown, Tennessee, for the petitioner, James Todd.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy Weirich, District Attorney General; and Bryce Phillips, Assistant District Attorney General, for the respondent, State of Tennessee.

**OPINION**

*Procedural Background*

This is an appeal from the Shelby County Criminal Court's denial of Petitioner's petition for post-conviction relief.

On Father's Day, June 19, 2006, Petitioner attacked Paula Fowler and her three-year-old son inside their home. On August 22, 2006, the Petitioner admitted to a police detective that over a period of five minutes, he struck Ms. Fowler's head with a brick approximately forty times and also hit her son with a brick three times on the head. A Shelby County jury convicted Petitioner of attempted first degree murder, a Class A felony, and aggravated assault, a Class C felony. The trial court ordered an effective sentence of thirty-five years. Petitioner's convictions and sentences were affirmed on direct appeal. *State v. James Todd*, No. W2009-01475-CCA-R3-CD, 2011 WL 198635 (Tenn. Crim. App. Jan. 12, 2011), *perm. app. denied* (Tenn. July 15, 2011).

On June 4, 2012, Petitioner filed a pro se petition for post-conviction relief with an accompanying brief. On August 6, 2012, the post-conviction court appointed counsel, who filed an amended petition on June 6, 2013, alleging that trial counsel provided ineffective assistance in pursuing a motion to suppress Petitioner's statement to police. The post-conviction court held an evidentiary hearing on February 27, 2014, and denied the petition the same day. A timely notice of appeal was filed.

*Factual Background*

The record does not contain a transcript of the suppression hearing, but the following facts were set forth in this Court's decision on Petitioner's direct appeal.

Robert Wilkie, a detective with the Memphis Police Department, testified that in June 2006 he was assigned to the case involving the attack of Paula Fowler and her three-year-old son. Detective Wilkie stated that Lieutenant Mark Mitchell of the West Memphis Police Department notified him that Todd, [Petitioner], was willing to talk to him regarding the case.

On August 22, 2006, Detective Wilkie drove to the West Memphis Police Department and observed Todd standing at the front of the station smoking a cigarette. He asked if Todd would be willing to come [to] the Memphis Police Department so that he could ask him some questions, and Todd agreed. Todd said that he was concerned about not having a ride home to West Memphis, and Detective Wilkie assured him that he would have a ride back home if he needed one. Todd rode in the front seat of Detective Wilkie's unmarked police car back to Memphis and was not handcuffed.

Upon arriving at the Memphis Police Department, Detective Wilkie took Todd to an interview room on the eleventh floor. Detective Wilkie and Todd sat in silence for approximately five or ten minutes until

Lieutenant Miller entered the room. At that point, Detective Wilkie did not immediately advise Todd of his *Miranda* rights. Detective Wilkie first asked Todd if he had known Charles Fowler. Todd explained that he had known Charles because he was a friend of Charles's brother, Sam. He said that he did not know what had happened to Charles's family other than the fact that Charles had committed suicide. Detective Wilkie testified that Todd was not under arrest and was free to leave at that point during the interview. He further testified that Todd never stopped talking and never informed him that he wanted to be taken home to West Memphis.

During the interview, Detective Wilkie informed Todd that Charles Fowler's wife, Paula Fowler, and their three-year-old son had been attacked, and his name had "come up in the investigation." He showed Todd some photos from the crime scene, which included broken bricks and blood on the walls and the floor. He asked Todd to consent to give him a DNA sample so that he could be eliminated as a suspect. Todd initially refused to give a DNA sample. However, when Detective Chatman walked into the room with a warrant to obtain a sample of Todd's DNA, Todd "almost simultaneously" consented to the DNA sample. Detective Chatman served him with the warrant, and Todd signed the consent form to provide a DNA sample. Detective Wilkie said that they took a break, and he asked Todd if he needed anything to eat or drink or if he needed to use the restroom. During this fifteen-minute to twenty-minute break, Detective Wilkie said that Todd was not handcuffed or shackled. He also said that he recalled that the door to the interview room was open.

Following the break, Detective Wilkie provided Todd with an advice of rights form regarding his *Miranda* rights. Todd read this form aloud and signed it. Todd also indicated that he understood his rights and wished to talk to the officers. Detective Wilkie and Lieutenant Mark Miller, who was present, also signed the form. Detective Wilkie informed Todd that they were giving him an opportunity to tell them what happened before the DNA results came back because once his DNA linked him to the crime they would not ask him any more questions about what happened. Todd immediately responded, "Well, how much time do I get?" Detective Wilkie told Todd that sentencing was "lawyer stuff" that the officers did not determine. Then Todd, who was still holding the crime scene photographs, dropped his head and said, "Okay, I did it." Detective Wilkie asked Todd to tell him what happened. During his verbal statement, Todd never stated that he wanted to stop talking and never indicated that he wanted to leave. After Todd gave the verbal statement, Lieutenant Miller left the interview

room. Detective Chatman and Detective Wilkie were present when Todd subsequently provided his formal, written statement. The written statement, which consisted of Detective Wilkie typing his questions and Todd's answers, started at 12:49 p.m. and was read and signed by Todd at 1:40 p.m. During this time period, Detective Wilkie stated that he never made any threats or promises to Todd in exchange for his statement. In addition, he stated that Todd never asked to speak with an attorney during the interview process. Detective Wilkie said that Todd was not under arrest at the time that he and Todd signed the advice of rights form; however, Todd was under arrest after he gave his statement of admission. The first time that Todd was handcuffed or restrained in any way was after he had signed his written statement and as the officers were preparing the charging documents. Detective Wilkie stated that Todd never indicated that he did not understand what was happening. In addition, he stated that Todd never told him that somebody else had threatened to hurt him if he did not commit the offenses. Detective Wilkie said that if Todd had never talked to him about what happened, he would have made sure that Todd was taken back to West Memphis. Detective Wilkie said that no tape or video recording was made of Todd's statement in accordance with police policy.

Detective Jerry Chatman testified that he assisted Detective Wilkie in taking Todd's typewritten statement on August 22, 2006. He was present during Todd's questioning and observed Detective Wilkie typing his questions and Todd's answers for the written statement. Detective Chatman said that he also retrieved a search warrant to obtain a sample of Todd's DNA. He stated that the only people present were Todd, Detective Wilkie, and himself at the time that the written statement was being typed. Detective Chatman said that Todd's statement was taken in a small interview room and that Todd was not handcuffed or restrained in any way. He said that Todd never indicated that he did not understand his *Miranda* rights prior to giving his written statement. He also said that Todd never said that he wanted to stop talking during the written statement. He further stated that he and the other officers never threatened or promised Todd anything during the interview process and that Todd never asked for an attorney. Detective Chatman stated that he observed the entire written statement and saw Todd read, initial, and sign the statement.

Todd testified that on August 22, 2006, a West Memphis police officer informed him that a Memphis detective wished to speak with him. Todd said that he went to the West Memphis Police Department and approximately thirty or forty minutes later Detective Wilkie arrived and

-4-

asked him if he was willing to ride over to the Memphis Police Department to talk to him. Todd agreed, and Detective Wilkie said that he would make sure that he had a ride back to West Memphis if he needed one. Todd said that he did not feel as though he were under arrest at the time that he left West Memphis with Detective Wilkie.

Todd stated that when they arrived in the interview room at the Memphis Police Department, the officers "shackled" his right leg to the floor prior to any questioning. Detective Wilkie told him that this restraint was police procedure. Initially, he and Detective Wilkie were in the interview room alone, and Detective Wilkie showed him some photographs. Detective Wilkie then left to get Todd a cigarette and returned with two more officers, including Detective Chatman. The officers asked Todd for a blood sample, which he initially refused. However, once the officers returned with a warrant for a DNA sample, Todd consented to provide a DNA sample.

Todd said Detective Wilkie asked him if he had known Charles Fowler, and Todd responded that he had known Charles through Charles's brother, Sam Fowler. Todd said that Detective Wilkie did not advise him of his rights at that point. Todd said that other than knowing Charles Fowler through Sam, he "didn't know nothing." Todd acknowledged that he never told Detective Wilkie that he did not want to talk to him about Charles Fowler.

Todd stated that Detective Wilkie took a break and then came back in the interview room with Detective Chatman. The detectives began asking Todd if he knew Charles Fowler's wife and son, and Todd responded that he did not know them. Todd said that the detectives told him that if he would not agree with them that he would "get a hundred years from the judge" and that his statement "could help" him regarding sentencing. Todd told the detectives that he did not know anything about the case.

Detectives Wilkie and Chapman took a break. When they returned, they were accompanied by another officer who obtained the DNA sample from Todd. Todd said that the detectives never told him that he had the right to remain silent or the right to an attorney. However, Todd admitted that he agreed to speak with Detectives Wilkie and Chapman.

Todd claimed that he did not see the advice of rights form until after he was arrested. Also, Todd said that he was unsure whether he signed the advice of rights form before or after he gave the formal, written statement. Todd acknowledged that he provided the words that were in his written statement. He further acknowledged that Detective Wilkie typed his question and then typed Todd's answer to that question. Todd said that he was able to read the question and his answer as Detective Wilkie typed it. He said that he did not read the statement before he signed it because he had given "them the statement already." Todd said that he was not told he was under arrest until after he gave his statement. He claimed his *Miranda* rights were never read aloud to him prior to him giving his statement. He said that he never asked for a lawyer because "he never had that opportunity." He also claimed that he was never told that he had a right to an attorney.

Todd stated that his leg was shackled for the entire interview process except for when he asked to use the bathroom. Detective[s] Wilkie and Chapman and another officer took him to the restroom and shackled his leg again when he was returned to the interview room. Todd acknowledged that the advice of rights form informed him that he was under arrest, that he had a right to a lawyer and that if he did not have money, an attorney would be appointed for him, and that everything he said could be used against him in a court of law. However, Todd claimed that he was not advised of these rights until after he had given his statement. However, Todd acknowledged that he had been arrested before and had been advised of his rights in those previous, unrelated cases.

At the conclusion of the hearing, the trial court found Todd's testimony to be "unbelievable" and "totally incredible." It did not believe that Todd was shackled to the floor in the interview room. The court also found that Todd gave his statement freely and voluntarily and that it saw nothing in the proof that Todd had ever indicated that he wanted to speak with an attorney. For all of the aforementioned reasons, the trial court refused to suppress Todd's statement.

*James Todd*, 2011 WL 198635, at *1-4. The suppression issue was specifically raised on direct appeal, and this Court affirmed the trial court's decision. *Id.* at 13.

Petitioner testified at the post-conviction hearing. His factual account of his encounter with the police was consistent with his testimony at the suppression hearing. Petitioner acknowledged that his trial counsel filed a motion to suppress his statement.

He could not recall whether he testified at the suppression hearing but agreed that it was possible that he did. When asked what more trial counsel could have done during the suppression hearing, Petitioner responded that he should have been "more aggressive" and "professional" during cross-examination of witnesses. Petitioner also complained that the photographs of the crime scene had been "tampered with."

Trial counsel testified that he was one of two public defenders representing Petitioner. He signed and prepared the motion to suppress. Trial counsel explained the process through which he prepared the motion:

> I talked to Mr. Todd about any and all points of the way he was interviewed, what happened during this when he met the police . . . I interviewed [Petitioner], and I asked of any concerns that he had. I established the details of which he was questioned, and then I prepared them in the way that I felt should be prepared to present to the court.

The motion to suppress contained thirteen numbered paragraphs, one of which made a reference to the fact that officers transported Petitioner to the police station. Trial counsel could not remember exactly what details of Petitioner's transportation to the police station he brought out at the suppression hearing. Trial counsel acknowledged that he did not include within the motion to suppress a factual reference to the officers' showing Petitioner photographs of the crime scene or presenting him with a warrant for a DNA test.

The record shows that a full hearing was held on the motion to suppress and that trial counsel made oral argument. Trial counsel stated that he was aware of *State v. Anderson* when he was preparing the motion and that, at the hearing, he argued for suppression of the statement based on the case law as it stood in 2009. *See* 937 S.W.2d 851 (Tenn. 1996). Trial counsel opined that the outcome of the trial would not have been different even if the statement had been suppressed, given the other evidence that was presented.

The post-conviction court made the following observations and findings during its oral ruling:

> I would have to believe [Petitioner's] testimony over [trial counsel]'s. But I still don't . . . there's no way that there was a faulty suppression hearing here. That's the whole issue. The suppression hearing was not a faulty hearing. We heard it all.
> . . . .

I don't see anything wrong with it. I don't see how it can be claimed at all that [trial counsel] was ineffective. I feel like everything he did was within the range of competence demanded of an attorney in a criminal case.

. . . .

[A]ccording to *Strickland* . . . the defendant first must show that counsel's errors were so serious as to deprive the petitioner of effective assistance of counsel. Well, I don't see anything that [trial counsel] did wrong at all—zero. Nothing. I would have to believe Mr. Todd in order to give any credence to that statement, and I just can't do it. I don't believe anything . . . Mr. Todd has lied under oath before, I think. It seems like I told him at the first suppression hearing that I didn't believe a single word he had to say; that I thought it was preposterous. I think what he had to say was preposterous today. So, the first part of *Strickland* certainly hasn't been met, and so it's not even necessary to go to the second. . . . I can't second guess the strategic decisions of counsel at trial. I know that he did his best to suppress this, and it was pretty evident, I think, [that] the statement was pretty damning. I think they may have been able to prove their case otherwise, but the statement was there. The jury believed it. They believed the victims in the case. And so, for all those reasons, I do not find ineffective assistance of counsel, and this [ ] petition for post-conviction relief is denied.

In its written order, the post-conviction court concluded that "the Petitioner has failed to prove ineffective assistance of counsel. More specifically, he has failed to carry his burden of proof as to either deficient performance or prejudice."

*Analysis*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, this Court gives deference to the post-conviction court's findings as to witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence. *Momon*, 18 S.W.3d at 156 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented below and is bound by the findings of the post-conviction court unless the evidence preponderates otherwise.

*State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). However, the post-conviction court's conclusions of law and application of the law to the facts are subject to de novo review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

On appeal, Petitioner argues that his trial counsel provided ineffective assistance by inadequately presenting to the trial court the facts and law regarding the motion to suppress Petitioner's statement to police. Specifically, under the multi-factored analysis established in *Anderson*, Petitioner contends that trial counsel should have focused on the fact that Petitioner was not free to leave because he was brought to the police station by the officers and did not have his own vehicle. Petitioner also contends that trial counsel's motion to suppress failed to allege that Petitioner's statement was coerced because he was shown graphic photographs of the crime scene and presented with a warrant for a DNA sample. Petitioner argues that trial counsel's errors prejudiced him because, had the statement been suppressed, there is a reasonable probability that the outcome of the trial would have been different in light of the remaining evidence. The State argues that the trial court properly concluded that Petitioner failed to establish by clear and convincing evidence that trial counsel's performance was deficient and prejudicial so as to entitle him to post-conviction relief.

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *Burns*, 6 S.W.3d at 461. In order to receive post-conviction relief based on a claim of ineffective assistance of counsel, a petitioner must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

To establish deficient performance, a petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. Counsel's performance is considered reasonable "if the advice given or the services rendered [were] within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). This Court "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. A petitioner is not entitled to the benefit of hindsight to second-guess a reasonably based trial strategy or a sound, but unsuccessful, tactical decision. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). To establish prejudice, a petitioner must show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

Considering the post-conviction court's credibility determination as to Petitioner's testimony, the record establishes that Petitioner's trial counsel discussed the details of Petitioner's encounter with the police and filed a motion to suppress Petitioner's statement as being an allegedly unconstitutional custodial interrogation without proper *Miranda* warnings. A full suppression hearing, including oral argument, was conducted during which two investigating officers and Petitioner testified as to their accounts of how the interview happened. The trial court denied the motion to suppress, and this Court affirmed with the following analysis:

> We conclude that the trial court properly denied the motion to suppress Todd's statement. The court accredited Detective Wilkie and Detective Chatman's testimony regarding the statement and determined that Todd's testimony was "unbelievable" and "totally incredible." The court further determined that Todd gave his statement freely and voluntarily and never indicated to the officers that he wanted to speak with an attorney during the interview process. Accordingly, we conclude that the evidence in the record does not preponderate against the trial court's findings.

*James Todd*, 2011 WL 198635, at *13.

Trial counsel testified that he was aware of the applicable legal standard governing custodial interrogations and that he orally argued that Petitioner's statement was unconstitutionally obtained under the factual circumstances related to him by Petitioner. There is no proof in the record to preponderate against the post-conviction court's finding that trial counsel's performance was not deficient in his presentation of the motion to suppress. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). From the facts reiterated in Petitioner's direct appeal, it is plain that testimonial evidence was provided during the suppression hearing about the details of Petitioner's ride with the police, the photographs of the crime scene shown to Petitioner, and the DNA warrant. Petitioner, by brief or testimony, has not specifically identified any evidence or testimony that trial counsel failed to present to the trial court for consideration during the suppression hearing that would constitute professional conduct outside of "the wide range of reasonable professional assistance" or below prevailing professional norms. *Burns*, 6 S.W.3d at 462. The substance of Petitioner's post-conviction claim is merely an attempt to re-litigate the suppression hearing under the meager assertion that his trial counsel could have done it differently. *See Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)

("The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation."). We agree with the post-conviction court that there is "zero" evidence that "trial counsel did wrong at all." Because Petitioner failed to prove his claim of ineffective assistance by clear and convincing evidence, the post-conviction court properly denied the petition.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE